**Albert O. STEIN, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**PACIFIC BELL TELEPHONE COMPANY, SBC Communications, Inc., SBC Telecommunications, Inc., and SBC Technology Resources, Inc., Defendants.**

No. 00CV2915 SI.

United States District Court, N.D. California.

Feb. 14, 2001.

Robert C. Schubert, Juden Justice Reed, Willem F. Jonkheer, Douglas G. Thompson, Jr., Schubert & Reed, LLP, San Francisco, CA, James R. Malone, Jr., Michael D. Gottsch, Nicholas E. Chimicles, Chimicles & Tikellis LLP, Haverford, PA, Burton S. Finkelstein, Douglas G. Thompson, Shannon P. Keniry, Roy A. Katriel, Roy Katriel, Finkelstein Thompson & Loughran, Duvall Foundry, Washington, DC, for plaintiff.

Robert A. Mittelstaedt, Craig E. Stewart, Jerone J. English, Kim Y. Arnone, Pillsbury Winthrop LLP, San Francisco, CA, Bobby C. Lawyer, Pacific Telesis Group Legal Dept., San Francisco, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

ILLSTON, District Judge.

On January 5, 2001, the Court heard argument on defendants' motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted. Having carefully considered the arguments of the parties and the papers submitted, the Court GRANTS defendants' motion with leave to amend as set forth below.

### BACKGROUND

Plaintiff Albert O. Stein ("Stein") brings this action on behalf of himself and all others similarly situated to challenge al-

leged anticompetitive conduct by defendants (collectively "Pacific Bell"), relating to Digital Subscriber Line ("DSL") service.

DSL is a service that provides consumers with dedicated, high-speed access to the Internet. Compl. ¶ 13. Utilizing new technology that permits simultaneous data exchange over voice service, DSL service is provided through already existing telephone lines and facilities, thus allowing users to have concurrent access to the Internet and traditional telephone service. *See id.;* Deft's Req. for Judicial Notice, Ex. A (Tariff F.C.C. No. 128), at rev. p. 13. According to Stein, Pacific Bell has a market share in excess of 85% of the DSL market, and controls the existing local telephone network and the supporting physical facilities through which DSL service is provided. Compl. ¶ 18. Competitors must rely directly on Pacific Bell's telephone lines and physical facilities for delivery of DSL service and to collocate the competitors' equipment with Pacific Bell's equipment. *Id.* at ¶ 26. Thus, Pacific Bell's existing local telephone network and facilities are "essential to competitors who wish to enter the DSL market," *Id.* at ¶ 19.

Pacific Bell is an incumbent local exchange carrier ("ILEC"), as defined by the Telecommunications Act of 1996 ("1996 Act"). As an ILEC, Pacific Bell was required to negotiate in good-faith and to enter into interconnection agreements with competitors to make available its local telephone network. Compl. ¶ 15. As a result, Pacific Bell entered into several interconnection agreements with DSL competitors. *See* Compl. Ex. A. Stein claims that, in violation of these interconnection agreements, Pacific Bell has "engaged in a pattern of anticompetitive conduct ...

generally designed to leverage Pacific's monopoly power obtained through its ubiquitous local telecommunications network .... with the intent and inevitable effect of injuring, thwarting or eliminating actual or potential [DSL service provider] competitors." *Id.* at ¶ 25.

According to Stein, Pacific Bell has "routinely and arbitrarily" denied physical collocation with its equipment and misrepresented the availability of space for collocation. *Id.* at ¶¶ 28–30. Pacific Bell has allegedly also stifled competition by requiring and charging unreasonable prices for collocation cages.[1] *Id.* at ¶¶ 31–32. Furthermore, Pacific Bell allegedly has discriminated against and imposed "hindrances and delays" on competitors trying to enter the DSL market by refusing to timely deliver collocation cages, dedicated unbundled transport lines and installed unbundled loops. *Id.* at ¶¶ 35–37.

Based on such alleged anticompetitive behavior, Stein charged Pacific Bell with violating section 2 of the Sherman Act, 15 U.S.C. §§ 2 et seq., and its state law equivalent the Cartwright Act, California Business and Professions Code §§ 16700 et seq.; the Telecommunications Act of 1996, 47 U.S.C. §§ 151 et seq.; and California Business and Professions Code § 17200. Pacific Bell now moves the Court to dismiss Stein's complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not

---

1. Collocation cages are barriers separating the physical space allocated to the competitor from Pacific Bell's equipment. Compl. ¶ 31.

whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

## DISCUSSION

Pacific Bell makes several arguments in support of its motion to dismiss. Pacific Bell argues that the unlawful conduct it is alleged to have committed derives exclusively from duties imposed by the 1996 Act. According to Pacific Bell, these duties go beyond any duties imposed by the Sherman Act, and thus there is no antitrust violation by the mere violation of the 1996 Act. Furthermore, Pacific Bell argues that the filed rate doctrine bars both the Sherman Act claims and the 1996 Act claim. Pacific Bell also argues that the state law claims are counterparts to the

federal claims and rely on the same factual allegations. Thus, Pacific Bell argues that the state law claims fail for the same reasons that the federal claims fail.

## A. Sherman Act Causes of Action (Counts I through IV)

In Counts I through IV of the Complaint, Stein alleged that Pacific Bell has engaged in a variety of anticompetitive conduct that violates section 2 of the Sherman Act. Placing heavy reliance on *Goldwasser v. Ameritech Corp.,* 222 F.3d 390 (7th Cir.2000), Pacific Bell argues that although the conduct Stein alleged may contravene duties imposed by the 1996 Act, such conduct does not violate the Sherman Act. Alternatively, Pacific Bell argues that the filed rate doctrine applies to bar Stein's complaint, which seeks damages for Pacific Bell's alleged anticompetitive conduct.

### 1. Application of *Goldwasser v. Ameritech Corp.*

■ *Goldwasser* involved a class of consumers of local telephone service suing Ameritech, which like Pacific Bell, was an incumbent local exchange carrier ("ILEC"). The plaintiffs alleged that Ameritech controlled more than 90% of the markets for local telephone service and controlled "essential facilities" that competitors could not duplicate. *Goldwasser,* 222 F.3d at 394. The plaintiffs also alleged that by "erect[ing] substantial barriers" and "engaging in a host of exclusionary practices made possible by its monopoly power," Ameritech was preventing competitors from entering the market. *Id.* The plaintiffs listed 20 specific instances of allegedly anticompetitive conduct by Ameritech. *See id.* at 394–95. According to the plaintiffs, Ameritech had violated both section 2 of the Sherman Act and the 1996 Act. *Id.* at 395. As an ILEC,

Ameritech was subject to extended duties to deal with competitors as detailed in section 251(c) of the 1996 Act. The court in *Goldwasser* noted that the plaintiffs' complaint "focuses tightly on the ILEC's § 251 duties" and all instances of illegal conduct alleged by plaintiffs were violations of duties arising under the 1996 Act. *Id.* at 394, 399–400. The *Goldwasser* court held that the 1996 Act "imposes duties on ILECs that are not found in the antitrust laws. Those duties do not conflict with the antitrust laws either; they are simply more specific and far-reaching obligations that Congress believed would accelerate the development of competitive markets." *Id.* at 401. Finding no allegations of a "freestanding antitrust claim," the *Goldwasser* court dismissed the complaint for failure to state a claim upon which relief can be granted.

Although the Ninth Circuit has not directly addressed the issues raised in *Goldwasser*, this Court finds that decision persuasive. Congress designed the 1996 Act to foster immediate competition in the local telephone service market with the aim of transforming regulated, monopolistic telecommunications industry into a competitive open market. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999); *GTE Northwest, Inc. v. Nelson*, 969 F.Supp. 654 (W.D.Wash.1997). To do so, Congress imposed on ILECs a host of special duties intended to foster market entry by competitors, and "foremost among these duties is the LEC's obligations under 47 U.S.C. § 251(c) to share its network with competitors." *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. at 371, 119 S.Ct. at 726. Section 251(c) provides detailed requirements for ILECs to cooperate with competitors or potential competitors by requiring ILECs to negotiate agreements in good faith to open up access to the ILECs' equipment and telephone lines at reasonable rates and terms. Even

if voluntary negotiations fail, an agreement can result from binding arbitration by the appropriate regulating agency, in conformity with the requirements of section 251. *See* 47 U.S.C. § 252(b).

By contrast, the Sherman Act holds that a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *see also SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 786 (9th Cir.1996). To prove antitrust liability under section 2 of the Sherman Act, "[i]t is not enough that a single firm appears to 'restrain trade' unreasonably." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). There must be "possession of monopoly power in the relevant market ... and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)); *see also Drinkwine v. Federated Publications Inc.*, 780 F.2d 735, 739 (9th Cir.1985) ("The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition.").

As the *Goldwasser* court noted, "in an effort to jump-start the development of competitive local markets, [Congress] imposed a host of special duties on the ILECs.... [that] go well beyond anything the antitrust laws would mandate on their own." *Goldwasser*, 222 F.3d at 399–400. A violation of the 1996 Act, therefore, does

not automatically equate to a violation of the Sherman Act. To the extent that Stein alleged violations of duties specified under section 251(c) of the 1996 Act, standing alone, Stein does not state a claim under the Sherman Act.

However, Stein argues that his complaint also included factual allegations that support "freestanding bases for antitrust liability" directly under the Sherman Act and independent of the 1996 Act, Opposition 8. Such alleged claims include: 1) Pacific Bell's denial of access to Pacific Bell's essential facilities, 2) its practice of engaging in monopoly leveraging, and 3) its attempts to monopolize the DSL market through breach of its interconnection agreements. *Id.* at 9.

The Court now considers the three allegedly freestanding claims that Stein raises—denial of access to essential facilities, monopoly leveraging, and attempt to monopolize. These claims survive only if Stein's factual allegations satisfy the basic elements of the claims. Count I of the Complaint charges Pacific Bell with denying access to its essential facilities. Count II charges Pacific Bell with unlawful monopoly leveraging. Count III charges Pacific Bell with attempting to monopolize through breaching interconnection agreements. Count IV charges Pacific Bell with attempting to monopolize by monopoly leveraging. Stein relies on the same factual allegations of anticompetitive conduct to support all four counts. *See* Compl. §§ 25–41.

### a) Essential Facilities Claim (Count I)

■ Stein claims that he has alleged an essential facilities claim that is independent of the 1996 Act. Pacific Bell argues that Stein, as a consumer, does not have standing to assert an essential facilities claim; and even if standing is found, Stein

has not alleged facts to satisfy the elements of an essential facilities claim.

■ The essential facilities doctrine imposes liability "when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir.1991); *see also City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1379 (9th Cir.1992) ("A company which has monopoly power over an essential facility may not refuse to make the facility available to others where there is no legitimate business reason for the refusal."); *MCI Communications Co. v. AT & T*, 708 F.2d 1081, 1133 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (holding AT & T violated section 2 of Sherman Act by refusing to connect MCI to its network, an essential facility). The Ninth Circuit has found four elements necessary to an essential facilities claim:

> (1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

*City of Anaheim*, 955 F.2d at 1380 (citation omitted); *accord Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 509 (D.C.Cir. 1999).

Stein did not allege that he was denied the use of Pacific Bell's telephone network, nor that he was a competitor in the relevant DSL service market. Stein has not alleged facts necessary to an element of the essential facilities claim. *See County of Stanislaus v. Pacific Gas & Elec. Co.*, 1995 WL 819150, *20 (E.D.Cal.1995), *aff'd on other grounds*, 114 F.3d 858 (9th Cir. 1997) (dismissing on 12(b)(6) motion an

essential facility claim by customers that defendant gas provider denied them access to its pipeline); *Bar Technologies Inc. v. Conemaugh & Black Lick R.R. Co.,* 73 F.Supp.2d 512, 520 (W.D.Pa.1999) ("Bar-Tech is merely a customer of the CB & L, not its competitor. As such, its essential facilities claim fails.").

Stein counters that the *Goldwasser* court "soundly rejected" a similar standing challenge against consumer plaintiffs in that case, who had also brought an essential facilities claim. Opposition 14. *Goldwasser* did not involve the particular question of a consumer plaintiff's standing to bring an essential facilities claim. The Seventh Circuit in *Goldwasser* upheld the lower court's finding that the consumer plaintiffs had satisfied the "antitrust injury" requirement to assert a Sherman Act claim on their own behalf.[2] *Goldwasser,* 222 F.3d at 398–99 (upholding *Goldwasser v. Ameritech Corp.,* 1998 WL 60878, *6 (N.D.Ill.1998), which rejected argument that "plaintiffs lack standing to bring Sherman Act claim ... because the causal link between the alleged conduct and harm is too indirect, the injury asserted by Plaintiffs is too speculative, and there is a risk of duplicative recovery...."). *Goldwasser* therefore did not establish third-party standing for consumers (who are not competitors of an ILEC) to bring an essential facilities claim.

Stein cannot rely on an essential facilities claim as an independent basis of liability directly under the Sherman Act. *Count I* alleging Pacific Bell denied access to its essential facilities is DISMISSED without leave to amend.

### b) Monopoly Leveraging Claims (Counts II and IV)

■ Count II of Stein's Sherman Act claims charges Pacific Bell with unlawful monopoly leveraging. Stein alleged that Pacific Bell had violated the Sherman Act by using its "monopoly power in the local telephone network market, however lawfully acquired, to foreclose competition and destroy competitors in the separate DSL market." Compl. ¶ 61. In Count IV, relying on the same allegations of monopoly leveraging conduct, Stein charges Pacific Bell with attempted monopolizing, adding the allegation that "[d]efendants have demonstrated a dangerous probability of success in their efforts to gain, perpetuate or enhance a monopoly in the DSL market." *Id. at* ¶¶ 69–70. Stein argues that these allegations plead the elements of monopoly leveraging and attempted monopolizing by engaging in monopoly leveraging, both in violation of the Sherman Act. Opposition 15.

■ The Ninth Circuit does not recognize monopoly leveraging as an independent theory of liability under section 2 of the Sherman Act. *Alaska Airlines,* 948 F.2d at 546 (disagreeing with *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)). Under Ninth Circuit law, however, a claim of attempted monopolizing may include allegations of monopoly leveraging conduct, "[i]f there is a dangerous probability that a monopoly will be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly." *Id.* at 549.

**2.** At oral argument, counsel for Stein suggested that *Goldwasser* recognized third-party standing for consumer plaintiffs to sue on behalf of competitors of an ILEC. *Goldwasser* did not so hold, instead stating that the consumer plaintiffs there had asserted their own rights and were not relying on third-party standing. *Goldwasser,* 222 F.3d at 398–99 ("[W]e think Ameritech is wrong to claim that the plaintiffs lack standing because they are attempting to raise third-party rights.... We are satisfied that they are asserting their own rights, and thus that they have standing.").

Count II of Stein's complaint—stating a claim of monopoly leveraging—is not recognized in this Circuit. Accordingly, *Count II* is DISMISSED without leave to amend. Count IV involves attempted monopolizing by monopoly leveraging. Stein has alleged that there is a "dangerous probability" that Pacific Bell will or has leveraged a monopoly in the DSL market which, under *Alaska Airlines,* suffices to state a claim of antitrust liability under the Sherman Act. *Count IV* of Stein's complaint therefore is cognizable under *Alaska Airlines.*

**c) Attempt to Monopolize Through Breach of the Interconnection Agreement (Count III)**

■ As an ILEC, Pacific Bell was required by the 1996 Act to negotiate interconnection agreements in good-faith with competitors who wished to enter the DSL market. *See* 47 U.S.C. § 252(a)(1). As a result of this duty, Pacific Bell entered into interconnection agreements making its equipment and local telephone network facilities available to competitors who wished to enter the DSL market. *See* Compl. ¶ 15 and Ex. A. According to Stein, Pacific Bell "entered into these optional and voluntary agreements and then breached them or proceeded to engage in bad faith conduct in carrying them out, without any business justification and with the intent to destroy its competitors ... so as to unlawfully maintain its monopoly." Opposition 9. Stein claims that such conduct violated section 2 of the Sherman Act because Pacific Bell was "attempting to exclude rivals on some basis other than efficiency," making its conduct "predatory." *Aspen Skiing,* 472 U.S. at 605, 105 S.Ct. at 2859. Pacific Bell argues that breach of a contract by itself does not give rise to antitrust liability. Reply 4 (citing *Vernon v. Southern California Edison Co.,* 955 F.2d 1361 (9th Cir.1992)). Furthermore, Pacific Bell argues that the interconnection agreements "were imposed by a statutory mandate, .... and any alleged failure by Pacific to adhere to them, do not give rise to any refusal to deal liability under *Aspen." Id.* at 5.

■ It is well established that a firm with monopoly power has no general duty to cooperate or deal with its competitors. *Aspen Skiing,* 472 U.S. at 600, 105 S.Ct. at 2856; *United States Football League v. National Football League,* 842 F.2d 1335, 1360–61 (2d Cir.1988) ("[A] firm with a lawful monopoly has no general duty to help its competitors.") *SmileCare Dental Group,* 88 F.3d at 786 ("[I]t is well established that competitors do not have a general duty to deal with one another."). In *Aspen Skiing,* the Supreme Court held that the absence of a duty to deal with competitors was not unqualified and described the type of exclusionary conduct that can violate the Sherman Act. *See Aspen Skiing,* 472 U.S. at 602, 105 S.Ct. at 2857 (general right not to deal with competitors cannot be exercised for a "purpose to create or maintain a monopoly"). A distinction must be drawn "between practices which tend to exclude or restrict competition, and the success of a business which reflects only a superior product, a well-run business, or luck." *Aspen Skiing,* 472 U.S. at 604, 105 S.Ct. at 2858. In this context, a defendant's intent is "relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' ... [or] 'predatory.'" *Id.* at 472 U.S. at 602, 105 S.Ct. at 2857.

*Goldwasser* did not consider whether violations of the 1996 Act, if done in a "predatory" manner as defined in *Aspen Skiing,* can make up an independent basis for liability under the Sherman Act. The plaintiffs in *Goldwasser* did not allege, as Stein alleges here, that the defendant breached interconnection agreements in bad faith

and engaged in other exclusionary practices. *Compare Goldwasser v. Ameritech Corp.,* 1998 WL 60878, *11 (N.D.Ill.1998) (plaintiffs relied solely on allegations that Ameritech violated provisions of 1996 Act to support their Sherman Act claims) *with* Compl. ¶ 39 (the alleged misconduct by Pacific Bell, "contrary to Pacific Bell's obligations under its interconnection agreements with CLECs, was designed to, and did, increase competitor costs and delay or prevent competitor DSL providers from effectively competing with Pacific...."). Although the interconnection agreements were statutorily mandated, see 47 U.S.C. § 252(a), Stein claims that Pacific Bell's alleged refusal to abide by the agreements constituted "predatory" behavior that "not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing,* 472 U.S. at 605 and n. 32, 105 S.Ct. at 2859 and n. 32. *Aspen Skiing,* held that " 'the long recognized right ... [to] freely [ ] exercise [one's] own independent discretion as to parties with whom he will deal' does not violate the Sherman Act *'[i]n the absence of any purpose to create or maintain a monopoly.'* " *Image Tech. Services. Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1211 (9th Cir.1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998) (citing *Aspen Skiing,* 472 U.S. at 602, 105 S.Ct, at 2857) (emphasis and alterations in original). Stein has alleged the type of conduct that exceeds a monopolist's right to deal or not to deal with competitors, in violation of section 2 of the Sherman Act.

*Count III* of the Complaint, charging Pacific Bell with attempting to monopolize in violation of the Sherman Act, as alleged, is cognizable under *Aspen Skiing.*

### 2. The Filed Rate Doctrine

■ In his Complaint, Stein alleged that defendants' anti-competitive conduct has resulted "in consumers like Plaintiff and the Class paying supra-competitive prices for DSL service." Compl. ¶ 39. Pacific Bell argues that the filed rate doctrine applies to bar Stein's federal and state antitrust claims. Section 203(a) of the 1996 Act requires local exchange carriers to file with the Federal Communications Commission ("FCC") tariffs "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Under the filed rate doctrine, "once a carrier's rate is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Evanns v. AT & T Corp.,* 229 F.3d 837, 840 (9th Cir.2000) (citation omitted). "[T]he filed rate doctrine precludes the plaintiff in an antitrust suit from claiming speculative damages.... [involving] a hypothetical lower rate that would have been charged in the absence of the [anticompetitive conduct] and the acceptability of those rates to the appropriate regulatory agency." *Stanislaus,* 1995 WL 819150, * 10 (citing *Keogh v. Chicago & N.R. Co.,* 260 U.S. 156, 164, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). However, the filed rate doctrine does not apply to cases not involving rates or rate setting. *See Central Office Telephone, Inc. v. AT & T,* 108 F.3d 981 (9th Cir.1997) (filed rate doctrine inapplicable in breach of contract dispute); *Columbia Steel Casting Co. v. Portland General Elec. Co.,* 103 F.3d 1446 (9th Cir. 1996).

Stein argues that his claims are not "price fixing claims," but instead "[s]ince the gravamen of Plaintiff's complaint is that he and the other Class members are locked into paying Defendants' tariffed rate due to anti-competitive conduct, and are precluded from paying the tariffed rates of competitors, the filed-rate doctrine

does not bar Plaintiff's damage claims." Opposition 17. In his complaint, Stein alleged that "a competitor of Defendants offers DSL service that is less expensive and has an adequate tariff on file, consumers such as Plaintiff and the Class cannot avail themselves of these more beneficial tariff rates because Defendants use their monopoly power ... to inhibit access by Plaintiff and the Class to such competing DSL service." Compl. ¶ 76. Thus alleged, Stein argues that this case is similar to *Columbia Steel Casting Co.* and *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144 (3d Cir.1993), which found that the filed rate doctrine did not apply.

In *Lower Lake Erie,* steel companies, trucking companies and dock companies filed suit against railroad companies alleging that the defendants "conspired ... to preclude potential competitors from entering the market." *Lower Lake Erie,* 998 F.2d at 1151. The railroad companies' rates were "only coincidentally implicated" because "if the anticompetitive conduct had not occurred, an entirely new alternative—shipping by truck as opposed to rail—would have been available" to the plaintiffs. *Stanislaus,* 114 F.3d at 864. Thus, *Lower Lake Erie* did not involve rates or rate setting and the filed rate doctrine did not apply.

In *Columbia Steel Casting Co.,* two power companies, Portland General Electric ("PGE") and Pacific Power & Light ("PPL") had entered into a non-competition agreement that divided the area into two exclusive service territories. *Columbia Steel,* 103 F.3d at 1453. The plaintiff was located in the PGE's service area, which charged a higher rate than PPL. *Id.* at 1454. The Ninth Circuit held that the filed rate doctrine did not apply because "the conduct challenged in this case is not [PPL's] refusal to sell electricity to Columbia Steel at a lower rate. Rather, the challenged conduct is the non-competition agreement [between PGE and PPL] that prevented Columbia Steel from buying electricity at PPL's lower rate." *Id.* at 1446. Columbia Steel had been prevented from using "a less expensive, equivalent service." *Id.*

In *Goldwasser,* 1998 WL 60878, *5 (N.D.Ill.1998), plaintiffs alleged that Ameritech had "effectively fenced-out competitors from the local telephone service market, thus preserving Ameritech's monopoly power and its ability to extract supracompetitive prices from consumers." The district court distinguished this situation from *Lower Lake Erie,* reasoning:

> Unlike the steel companies in *Lower Lake Erie,* consumers in the local telephone market are captive to rates approved by the state PUCs. Any measure of damages in this case would necessarily involve the Court's determination of a hypothetical lower rate that would have been approved by the various state PUCs—exactly the messy task which the filed rate doctrine seeks to avert.

*Id.* at *6.

This Court finds the instant case closer to *Lower Lake Erie* and *Columbia Steel* than to *Goldwasser.* Like *Columbia Steel* and *Lower Lake Erie,* it appears that Stein has alleged denial of access to already existing services that are less expensive than Pacific Bell's DSL service. In his complaint, Stein alleges having to pay higher prices for DSL service because Pacific Bell's anti-competitive actions "(1) ... have increased the cost to the industry players of providing DSL service to consumers like Plaintiff and the Class; *and/or* (2) even where a competitor of Defendants offers DSL service that is less expensive and has an adequate tariff on file, consumers ... cannot avail themselves of these more beneficial tariff rates because of Defendants' use of their monopoly pow-

er...." Compl. ¶ 76 (emphasis added); *see also id.* at ¶¶ 57, 66, 71 ("[C]onsumers have been damaged in that they have been denied free choice in the DSL market, they have paid higher prices for DSL service and have been forced to use inferior DSL service."). Unlike cases applying the filed rate doctrine, Stein's theory of damages need not rely on a hypothetical lower rate or, as Pacific Bell argues, that "had Pacific Bell better fulfilled its alleged duties to assist [competitors], they would have passed the benefits of the lower costs and better service from Pacific along to plaintiff in the form of lower rates."[3] Reply 13; *see, e.g., Management Servs. v. Washington Natural Gas Co.,* 99 F.3d 937, 944 (9th Cir.1996) (damages too speculative because it "would require a showing that a hypothetical lower rate should and would have been adopted"); *Stanislaus,* 114 F.3d at 865 ("In the instant case ... no matter what the reality of the alleged anticompetitive behavior, plaintiffs here would still be paying PG & E's rates. That those rates could theoretically be lower is precisely what compels application of the filed rate doctrine.").

Stein's complaint, however, does not clearly state that his damages are attributable to denial of access to existing lower filed rates, instead pleading this theory in the alternative. *See* Compl. ¶ 76. As alleged, Stein's remaining Sherman Act claims—*Counts III and IV*—are insufficiently plead to avoid the filed rate doctrine, and are DISMISSED with leave to amend. If he so wishes, Stein should amend these counts to clearly and specifically rely on already existing lowered tariff rates for DSL service.

---

**3.** In addition to seeking damages for such alleged anticompetitive conduct, Stein requested injunctive relief against the challenged conduct. Compl. p. 27. The request

## B. Telecommunications Act Cause of Action (Count V)

 Stein relies on the same factual allegations that support his antitrust claims to support a cause of action under the 1996 Act. Opposition 1–2. According to Stein, the anticompetitive conduct alleged throughout the Complaint "has injured consumers ... in that they have been denied free choice in the DSL market, they have paid higher prices for DSL service and have been forced to use inferior DSL service." Compl. ¶ 75. Pacific Bell argues that the filed rate doctrine bars Stein's claim for damages under the 1996 Act. Motion 16–17.

 Sections 206 and 207 provide individuals a private right of action for injuries resulting out of violations of the 1996 Act. Both sections contemplate suit only for recovery of damages, not for injunctive relief. Section 206 states: "In case any common carrier [commits] any act, matter, or thing ... prohibited or declared to be unlawful, ... such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation ...." 47 U.S.C. § 206. Similarly, section 207 allows "[a]ny person claiming to be damaged by any common carrier ... [to] bring suit for the recovery of the damages for which such common carrier may be liable ...." 47 U.S.C. § 207. Thus, unlike his Sherman Act claims, Stein can only seek damages for Pacific Bell's alleged violations of the 1996 Act.

The Seventh Circuit in *Goldwasser* found that the plaintiffs' allegations of violations of the 1996 Act "boil[ ] down to a claim for overcharges Ameritech has been able to impose upon" them. *Goldwasser,*

for injunctive relief is consistent with Stein's challenge of Pacific Bell's conduct, not just its DSL rates.

222 F.3d at 402. Although plaintiffs tried to assert monopoly claims, the court found that the claims "necessarily implicate[ ] the rates Ameritech is charging." *Id.* at 402. Thus, the plaintiffs' 1996 Act claims were barred by the filed rate doctrine. *Id.*

Stein's 1996 Act claim suffers from the same problem. In addition to having alleged that he paid higher prices, Stein alleged that Pacific Bell's violations of the 1996 Act denied him a free choice in the DSL market and forced him to use inferior DSL service. These injuries arise because Pacific Bell's alleged anticompetitive conduct precluded competitors actually offering lower rates from entering the market. However, the 1996 Act permits Stein to recover only damages for the alleged violations. The measure of recoverable damages "necessarily implicates" Pacific Bell's filed rates and "boils down" to a claim that Pacific Bell is overcharging its DSL subscribers. The filed rate doctrine bars such claims.

*Count V* of the Complaint is DISMISSED without leave to amend.

## C. State Law Causes of Action (Counts VI and VII)

 Pacific Bell argues that the state law claims "are predicated on the same alleged conduct as the federal claims." Reply 14. According to Pacific Bell, the state law claims should be dismissed for the same reasons that the federal claims should be dismissed. Motion 19. For the same reasons that the Sherman Act claims, Counts III and IV, are being dismissed, the Court DISMISSES *Counts VI and VII* with leave to amend.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Pacific Bell's motion to dismiss for failure to state a claim upon which relief can be granted. *Counts I, II, and V* of the Complaint are DISMISSED without leave to amend. *Counts III, IV, VI and VII* are DISMISSED with leave to amend. If he so wishes, Stein must file a First Amended Complaint **on or before March 2, 2001.**

**IT IS SO ORDERED.**